We have an admission to the bar this morning. Mr. Stevens, will you approach the podium please? I move the admission of Jeffrey Stevens to the bar of the Court of Appeals for the Federal Circuit. Mr. Stevens is a member of the bar in good standing of the highest court in California. I have knowledge of his credentials. I am satisfied that he possesses the necessary qualifications. Mr. Stevens has provided exemplary service indeed as law clerk in my chambers, and I trust will continue to do so for the remainder of his term. And so I move the admission of Mr. Stevens. If my colleague Judge Lurie is willing to act on that motion. Well, as the presiding judge for this purpose, I consult with my colleague across the bench, and I think we have unanimous agreement that Mr. Stevens should be admitted to the bar. So would you be prepared to take the oath to grant the motion? With your right hand, I swear to affirm that you report yourself to the attorney and counsel of this court, uprightly and according to the law, in support of the Constitution of the United States of America. I do. Congratulations and welcome to the United States Court of Appeals. You're welcome to the bar, Mr. Stevens. We shall proceed. We have a first case to be argued this morning, a member only, Ronald O. Katz acknowledges against American Airlines and others. We communicate to counsel. We had trusted, we had advised you in advance that we have enlarged our usual time to 30 minutes per side, which you may divide among yourselves as you see fit. We will time it so Mr. Graves, you would argue first. Is that right? So we shall ask the bailiffs to time that at 10 minutes rather than the five as originally scheduled. And Mr. Pietrantino also, and you can divide your rebuttal time as you see fit. And counsel for the same, we understand that Mr. Perry is going to argue all of the issues that are here, and so we shall time that also as 30 minutes. All right, we can then proceed. Mr. Graves, if you're ready. Yes, Your Honor. To be clear, I can go for 10 and you can go for 4. Yes, and if you would like, then we'll go on after 10 so that if you're in the middle of a sentence, that's allowed to finish it. Yes, yes, precisely. Now we had also wanted to communicate to you in advance, I know this is quite short notice, but I'm sure you're all aware that the issues that are perhaps the most difficult for us and complex are those of the written description and indefiniteness. And so we would appreciate it if you would concentrate as well as you can. I will understand there are other significant issues, but they are well briefed, and we shall do our best with the briefs in order to explore those issues. Is that feasible on your short notice? Yes, Your Honor, but I will tell you up front, Mr. Pietrantino is prepared to address all of the related issues today while I'm prepared to address the other issues raised in the appeal. Well, all right. And if you would allow some of your time to your colleague, that's all right. Thank you. And I will start by addressing the due process issue. May it please the Court, Katz has raised the issue of due process in connection with the Court's refusal to sever and say of unassertive claims that Katz has excluded in accordance with the district court's claim limitation case. Cablevision asserts in its brief on behalf of the other defendant affiliates that the constitutional challenge raised by Katz is unprecedented. That may very well be, as to our knowledge, the wholesale deprivation of patent rights incurred below the MDL proceeding is itself unprecedented. Indeed, it is telling that every case decided by the defendant affiliates involves a situation in which the patentee stipulated in advance of trial that all of its claims would rise or fall based on an adjudication with a limited set of representative claims. Mr. Katz has all these patents. He's brought them into the courts. Courts have to find a way to manage complex litigation. And so the Court has narrowed it down and said, if there's anything amiss that should be raised, let me know. Isn't that sufficient? What happens here is not the Court saying, let me know if I've missed something. Rather, the Court said, first task, out of all of your claims, nearly 2,000 of them have been patents in suit. Go down to a global set of no more than 64 across all defendants, who at the time numbered 67 separate defendants, most of whom had unique call processing systems, and then said, if you want to add more, you must show that the claims you wish to add are not duplicative of claims already in your set of 64. The problem with that is twofold. First, it violates the presumption of validity. All claims are presumed to have a distinct scope and be valid. Second, it turns the blonder tongue doctrine on its head. Under blonder tongue, issues of claim preclusion are to be addressed in a subsequent proceeding after entry of final judgment on a certain set of claims. In that context, it is the burden of the defendant to show that the claims being asserted in that subsequent proceeding are duplicative of the issues that have already been litigated. It violates blonder tongue to say, in the context of the original proceeding, discovery is ongoing before there's been any merits adjudication of any claim, that the patentee must demonstrate to the district court that its presumptively valid and distinct claims are, in fact, distinct. Is the remedy that you're requesting that the trial proceed on every claim or only that there be an opportunity if, for whatever reason, the trial does proceed on the claims that have been selected adversely to your client, that another trial can be had on the others? Our request of remedy is that to the extent the final judgment that have been entered for these defending after these otherwise stand, depending on the ruling of the court on validity and infringement issues, then Katz's request for severance and stay that was denied actually be granted. The court be instructed below to sever and stay the claims that Katz had to exclude from the global claim set as a result of the claim limitation order. And then, after final adjudication of the limited claim set, there may or may not be any subsequent proceeding on excluded claims. If there is, that's when the district court should undertake the blonder-tongue-raised-judicata analysis where the defendant will have to show that the claims have already been litigated through the prior adjudication. Was there anything in the district court's judgment to preclude that procedure based on proceeding to trial on the selected claims? The district court denied the motion for severance and stay of the excluded claims, so we proceeded to summary judgment on just the limited claims that Katz was able to select, consisting of the court's claim selection order and claim substitution construct. Summary judgment was then entered for these defendants on those particular claims. We are asking that this court hold that the request for severance and stay should be granted and that to the extent these final judgments are upheld in other respects, that they apply only to the claims that were actually litigated. Now, this court's ruling in the North Point case in 2005, I think, is instructive here. There's a common thread running through this court's jurisprudence regarding review of claim limitation orders in patent cases, and that is where the parties stipulate in advance of an adjudication that although their claims and defenses are going to rise and fall on a common representative set of claims, then there will be preclusion as to all other claims that could have been asserted from the patent suit. But in North Point, the parties went to trial on three claims. The jury found infringement but invalidity as to each of the three claims. On appeal, the defendant argued in a cross appeal that the invalidity ruling should be extended to the other claims that were not actually litigated from the patents in suit at trial. This court declined to so extend the invalidity holding because the parties had not agreed in advance to have all their claims and defenses rise and fall on the basis of that trial. And that's the situation here where the patentee did not consent to an adjudication of all of its possible claims under the patents in suit based on a set of representative claims, and in fact, requested a severance and stay. If there are no further questions, I'll yield the floor to Mr. Piantonio. Okay, no questions. Thank you, Mr. Gools. Mr. Piantonio? Good morning, Your Honor. As Mr. Graves indicated, I'll be addressing the invalidity issues that are before the court. I think there are three types of errors that the district court made below. The first would be that the district court did not hold the defendants, the movements here, to the clear and convincing burden standard to which they were required for proving invalidity. Second, on these motions for summary judgment, rather than drawing inferences in favor of the non-moving cats, there are many instances where even though there was substantial evidence presented by cats, sometimes without any evidence presented counter to cats' evidence, the inferences were actually drawn in favor of the movements of the defendants. Third, in those instances where there was compelling and competing evidence, including one example where the court found that there was equally plausible interpretations, the court actually found, again, for the movement, as a fact finder, rather than leaving the issue to be determined by a fact finder at trial. I'd like to present two examples that would show where these errors actually occur. The first involves an indefinite mis-issue regarding claim 13 of the O-65 patent. In connection with that patent claim, there was an assertion that the claim was invalid under 112, second paragraph, for failing to appropriately associate a structure within the specification with a means element, in particular, a means for receiving D-ness. The court received competing experts' statements, declarations, and evidence, which described the specification. Cats' expert, Dr. Brody, explained in detail why it was that those elements were, in fact, adequately linked to specific elements within the drawing figures and in the written description. The court also received Dr. Torrey's expert declaration by the defendants and determined that both had presented equally plausible positions. Despite that, and despite this court's explanation in the Telecordia case this summer, which indicated that a claim is presumed valid and that the burden is, in fact, on the challenger to show that the ordinary artisan would not understand the link, here, where there was equally plausible evidence, the court should have ended its consideration of this motion for summary judgment and denied it. But instead, the court, in fact, acted as a fact finder and instead of denying the motion, granted the motion. Could we turn to some specifics with respect to the 223 and 120 patents? I think they share the same specification. I'm interested with reference to Figure 2. I think it's in both patents. My question is, what is the difference between interface format and operating format if you use those terms? Might I just grab a copy of that? Of course. Thank you. In the patent description, first of all, the use of the term format was used in multiple ways in an attempt to try to describe the operation. That's what I had trouble with, the multiple ways the format was used, and that's created difficulty for me. What's the specific, addressing specifically operating format and interface format, what's the difference as the patents use those terms? Well, I think, Your Honor, in connection with, I think we start with the term format and the way that the court initially construed it, and then we turn our attention to how the... I'm not concerned with how the court construed it. I'm concerned with what the patents disclose as to the distinction. What's your position as to the difference? Our position would be that there are interfaces that occur between the user who calls into the system, who then must access what amounts to be an operating format or a system that's run by the processing equipment associated with the system. Well, turn to Figure 2 of the 120. Is it your view that the interspace format is everything above 52 and the operating format is the entire figure? No, how would you describe it? What is the interface? Show me what portion of that figure is the interface format. I believe, Your Honor, the interface format would deal with the acceptance of the calls into the various... Give me in terms of the figure. Show me where the interface format is on the figure. What I'm proposing to you is, is it the portion of the figure down to 52? No, Your Honor. The interface format actually has to do with the system as it receives the calls at the ARU. At best, it would be at elements 54, 62, and 50. Actually, I think we have to take into account that we have the three different ARUs. I think we can't separate Figure 2 from Figure 1 completely. I think we have to look at the interface format being operated by the ARUs and Figure 1, namely Box 18, Box 20, and Box 22, which then actually receive the phone calls, receive the 800 call, the 900 call, the area code number call, and then take that information and provide it to the format that are shown here in Figure 2. And is the rest of Figure 2 all the operating format as the patent user sector? I would say it's multiple operating formats in this particular circumstance because as you come in on various ones of the branches, what happens is the caller is actually treated to different call flows. And so as a consequence, you have multiple operating formats disclosed in Figure 2. When you refer, if I can change patents. Absolutely. In the 863 patent, Claim 96, you refer to, I think, means for processing. I believe that's in the 863. What is the function of processing that you describe in that claim language? Claim 96, the next to last limitation, means for processing at least certain answer data. But what is the function that is being described there? The 863 patent? I'm sorry, the 863 next to last limitation. Well, I'll read the language to you. It's featured in the books. So, it's means for processing at least certain answer data signals relating to selected ones of said individual callers. What's the function you're claiming there? I believe that the function is defined by all of the elements there. If I might grab my brief. Sure. Thank you. The function would encompass, as I understand it, Your Honor, all of the operations that would occur in connection with the processing operation for the means. So, to the extent that the limitation includes the additional elements, it helps us understand processing generally. But the processing operation in the 863 patent, as explained by Dr. Brody, is such that as to processing generally, because there's no specific function that's being performed by the processing, that those other elements are merely descriptive of what's involved or related to the processing, but not specifically the operations being performed by the processing, that that element of processing would still be understood in a general term by one ordinary skill in the art to encompass the general processor that's illustrated in the drawing figures. I guess I'm unclear as to what this limitation adds. If all you're saying is there's a processor here and it does something, you're not focusing in the plain language on any particular function, I take it, unless this is a reference to the various functions that are described in the specification. Well, I think that you're right, Warren, in the sense that, as in some of the prior cases, on the notion of whether or not there are algorithms that are necessary in connection with processing functions, the question is turned on, where is the invention, and what are we pointing to as the novelty of the invention? In this particular circumstance, we are not focusing on the processing element per se. Unlike the WMS gaming case where this issue first arose, and unlike in the other more detailed instances, for instance an aristocrat blackboard, net money in, where there are specific particular functions being performed, which are important to the patent validity and important to distinguishing the patent. Every claim limitation is material. You're not saying forget about this limitation, it's in the claim. No, I'm not saying that it's immaterial, Your Honor, and I apologize if that's what it seemed that I was implying, but what I'm trying to suggest, however, is that while it is material to the description of the means and bounds of the claim, it is not where the point of novelty turns, and as a consequence, we did not describe in more detail a more specific processing function. We described elements that might be associated with the processing, but we did not describe or claim or have to claim a particular function. Okay, related question, again with the same patent. Do you have the patent there before me now? I'm having difficulty finding it. That's the problem the district court judge obviously had with this complex case, and why he narrowed it down. Well, I understand the complexity that the district court faced, absolutely. He's not the only one that's had to face that. I think a number of us have, Your Honor. Three of us up here certainly have. The column four of the 863 at line 52, note that the interface may actually perform analysis on data. Is that analysis, the DNIS and ANI analysis, is that what the interface performs, or is there other analysis that the interface performs as disclosed in the state? Your Honor, it performs both analysis on DNIS and ANI, and it provides analysis on other data that it's received in the process of the call. Such as what? Well, in process, what was described in the specification was that the operations that were being performed by the other processors shown in the drawing figure could also be performed by the interface processor. So to the extent that there was processing on qualification, for instance, taking call or number information to qualify them as to whether or not they should have access to a given format. Other processing that was described within the specification for the processors, PR1 through PRN, were all captured or could be captured in the interface processor 20, but the patent draftsman provided that shortcut, if you will, in drafting the application to indicate that there was this capability, this functional capability of the interface processor, but that they were going to be describing more of the details of the operation as it related to the other processors instead, rather than have duplicative disclosure. If I may ask one more specific question. Yes, please. This one with respect to the 065 patent claim 13. Okay. You have a reference. I believe I have that one. Okay. You have a reference in the very last limitation to the processing means dot, dot, dot, based on a condition coupling an incoming call to the operator terminal. I wanted you to tell me where in the specification there is structure that describes the based on a condition coupling limitation. I believe, Your Honor, in connection with... I'll have to find the exact site, Your Honor. This wasn't actually brought up in the briefing. Well, actually, you do discuss it in your briefing. At page 51 through 52, I believe, Let's see. 50 to 51. You describe the structure with respect to most of the portions of that claim, but you don't refer to any structure that relates to the limitation that I referred to based on the condition. So I wondered whether that omission was something that should concern me. Your Honor, in connection with this particular part of our presentation, when we were focusing on the elements in terms of what it was providing, our position has been that in connection with the processing means generally that we had to look at the function as a whole and that when we looked at all of the elements, all of the operations that were being performed by that particular means, that we were in a situation where if we provided some specific structure that supported the means, then we were not engaging in functional claiming. So we did not go through and parse for each one of the individual functions or processes, I should say, within that one unitary function for that processing means. We didn't have an individual structure for each one of those. What we did was we tried to look at the function as a whole and identify the structures that would perform the function as a whole. I guess what I'd like to just raise is one more issue in connection with the invalidity. Actually, I see that I'm about to go into microphone. No, we do serve you a better time, so do tell us whatever else you need to tell us. I just wanted to raise the issue with regard to the obvious misfinding, particularly as it relates to the combination of the Schwamm and student registration references. In essence, the court below was presented with Dr. Brody's expert opinion based on the view of a person of ordinary skill in the art as to the fact that the proposed combination, the combination that the defendant set before the court, would just not work for its intended purpose. Despite that showing, which under the Dupuy case indicates that if it was not going to work for its intended purpose, we were showing a lack of predictability, if you will, as part of the KSR analysis, then this combination would not have been appropriate. And yet the court looked at the combination and still adopted it, not accepting the evidence presented by Mr. Katz and instead making a factual determination in the direction of the defendants. What's worth noting, however, is that the defendants here on appeal have adopted a different rationale for the combination of those references. They haven't even maintained the same position that they maintained below and that the court adopted, but instead have taken a different one. We think that this is further an indication that the court's earlier adoption was inconsistent with Dr. Brody's explanation why it was technically inappropriate to combine those two references and that therefore the motion for summary judgment of obviousness should have been denied. Okay. Any more questions for Mr. Pietrantonio? Okay. Thank you. And we'll save you a little time and you can divide it as you see fit. I suppose based on what Mr. Perry tells us. Mr. Perry. Thank you, Your Honor, and may it please the court. Judge Bryson, if I may start where Mr. Pietrantonio was not. The claim does not recite processing means for processing, which essentially would have answered your question. It recites processing means for carrying out the various functions recited in the specification. We go back to that 863 patent where you started with Mr. Pietrantonio. Column 9 very specifically describes that the processing means is a mini-computer that can do programs to carry out the various functions described below. And then the spec goes on for multiple columns describing those functions which generally relate to the qualification of tolerance. In other words, in the first one, the mail-order format. If I can stop you for just a second so that we're both on the same page here. The language that I was concerned with, and there are a number of claims and several patents that have similar languages. It varies a little bit. But the one that struck me as being the most central to my concern was the language in Claim 96, which is means for processing. I mean, what does that entail? I mean, I think you were going there. But the language is not, you know, processing means for doing X. That would fit nicely into the aristocratic cases. But this is means for processing. Well, Your Honor, let's take it as that. At Markman, the parties agreed that that's a 112 paragraph 6 claim. Okay. Whatever that means in this context. Well, what I mean is the parties agreed that the lean structure was Processor 92. And the district court said that its claims were in balance with the parties' agreement. Then I'll take you, if I could, to column 9 in the specification which sets out what Processor 92 does, which is more than just processing. Rather, it can be programmed to take into account consideration, blah, blah, blah. It can be programmed or formatted, blah, blah, blah. It can be programmed to do the functions that are then recited in the following columns. And then the spec moves into what the parties have used by shorthand, the mail order format, and other things describing the functions of this processor, which is to take in the collar entered data, credit card number and so forth, and qualify that collar for whatever it is the system is being used for. In other words, the specification puts a gloss on processing, which the patentee is, of course, allowed to do under Phillips that the court must take into account. But that lean structure being identified as Processor 92 or Processor 1, it doesn't matter, same thing, is not just processing. It is processing to carry out the various formats described then on the specification. So what you're saying, I take it, is at least in this unique setting where one says means for processing, that the processing then really has to be read as if it said means for X, Y, and Z. Those X, Y, and Z all being found in the specification, which describes what the processor does. That would be one way to look at it. Another way to look at it would be processing in itself is purely functional. Processing for what purpose? Because processing means processing in circular. The specification that describes the functions that that processing is carrying out. In other words, it's not processing for its own sake, running circuits, you know, digits around a circuit. It is instead processing for the purpose of producing an output. What those outputs are are the functions that are described in the specification. That is the reason that Interface 20 cannot be that processor, both because on the drawings it is up front and is only handling the ANI and DDoS data. It's not handling the call or enter data, and that's very clear. And second... Well, they say that it can do anything, and that they reveal that the interface can do anything, but the other processor is designated 10. Well, first, Martin may agree that the processor 92 is the link structure, not the Interface 20, but if you look at the drawings around it, and the 065 path that you pointed, Mr. Pietro, that's only up to Figure 2, shows that the Interface 20 cannot be coupled to the terminal, only the processor is, so that the way that the logic flow runs in the specification, only processor 92 can meet that interconnection with or couple the limitations. Interface 20 cannot. In fact, Interface 20 is always described only in the context of ANI and DDoS data, specific data, server data, not call or enter data. The only structure presiding in the entire specification that can handle call or enter data is processor 92, which leads to the risk of that problem. Because what processor 92 says... Call or enter data as opposed to identifying the called or calling number. Correct. ANI and DDoS being data provided by the communication system rather than the caller. And that's the distinction between those two structures. And again, the risk of that problem arises because for processor 92, the patent team described it as a computer that can be programmed, but then left out of the specification how it can be programmed. It left out the logic, the algorithms, the necessary information to disclose how that mini-computer works. And that's smack in the middle of aristocrat, just as it's your curriculum. And Interface 20 can't be away out of that box because it doesn't fit with the patent team's own specification diagrams. Well, if you look at the software patents, as the functions are described, and if the programming is routine, need not include that which any person of ordinary skill. So why is this different? Judge Newman, this patent is describing a series of formats, for example, a mail-order format to qualify the callers. The patent doesn't suggest that there is an off-the-shelf software program that can be plugged into the computer. That would, of course, be adequate planning. Not off-the-shelf, but a routine skill. But even a routine program. It does not say programmed as routine for this art. There is no programming at all disclosed in here for how the qualifications are to be handled by this processor. It's entirely shrouded in secrecy. It is not disclosed to anybody how to make the machine that does what these claims and specifications describe. It's not that there is an absence of specificity. There's an absence of disclosure altogether. And that is what the aristocrat will design to prevent. Our argument is not that they said something but not enough. It's that they said nothing at all. And the patentee, of course, recognizes this program. Again, the specification says that the computer can be programmed. It recognizes the need for programming, but it never discloses what that programming is or says that it's available to one skill in the art. And their expert doesn't say that there is an off-the-shelf program. It would have to be custom programmed, but it doesn't show the logic flow or algorithm how it would do it. No programming for any function in a software-type claim would be custom programming. And what I need your help to understand is why this is different from the hundreds of thousands of patents that have been granted which don't contain algorithms. Your Honor, here they're not claiming the software or even the function. What they're claiming is an apparatus, a method of using the apparatus or a system that carries out these various functions. And what they've described is only the functions and not the way to do it. And what the aristocrat says in so many words is that a general-purpose computer... Oh, and by the way, this is only a 112 paragraph 6 problem. This is not a case that it only arises in 112.6. Where the patentee elects to use 112.6 and describe a means plus function, then the quid pro quo, if it's a computer-implemented function, is the sufficient programming and algorithms that have to be described. A patentee could not proceed under 112.6, could describe in the claim itself adequate structure or other means for carrying out that function. But whereas here the patentee goes under 112.6, the obligation then is to recite an algorithm. But that's what I need to understand. The aristocrat was a panel decision. It didn't overrule the many decisions which have recognized claiming box by box, function by function. On its facts, certainly these few more recent cases were based on the complexity and the novelty support requiring more information, requiring the algorithm even though in the past in general the algorithms have not been required. So I need your help in understanding why this fits in that class of cases. The line of cases goes back to WMS Gaming, of course, through Aristocrat, to the court's very recent unpublished decision in Brown, where in this context, computer-implemented systems that have a linked structure in a 112.6 claim, a microprocessor, the programming has to be disclosed. That is not in conflict with any other decision of this court because they're not claiming, if I'm understanding the court's question correctly, the claim here is not for the software program that can carry out the functions, rather it is a system that requires programming input to make the system work. And the failure here is by simply pointing to a black box but not identifying for the public at large how that black box can be programmed to make this thing work, they haven't carried out their disclosure obligations in the past. And, sorry, that doesn't quite answer the court's question. I don't think that that's in conflict in any way with any decision of this court. Rather it is a straightforward application of Aristocrat and WMS Gaming just as the district court, right? But doesn't that position require that the programming not be routine? Your Honor, there's no suggestion here that the programming is routine or that there is an off-the-shelf product. And if it were routine, then the academy's obligation would be to disclose at least the logic flow or something else that would disclose to the public how to make the system work. The problem with Aristocrat identifies is it's not enough to say, here, have a system, hook it up to a computer, and it will give you the results you want. You've got to show how that computer is going to work. That's the Aristocrat problem and this system fits directly into that problem. Could you address briefly the question, one of the questions I addressed to you, opposing counsel, with respect to the 223 and 120 patents? What do you understand to be the distinction in the specification, well, in the patents in general, specifications and claims, between the interface format and the operating format as those terms are used in connection with those two patents? Our understanding, Your Honor, is in the 223, for example, I believe you asked about figure two? Yeah. Figure two entirely describes the single operating format. The interface format, which is an infrequently used term in these patents, I believe, format there is not being used in the same way as format is used elsewhere. The interface format is simply the operations of the interface device, interface 20, in most of the drawings. In other words, the initial taking in of the call and if relevant to that particular claim, the use of the necessary data. But that front-end thing, when it goes past the interface and moves into the processor and other parts of it, the operating format then is disclosed in this figure two. So, would you say that figure two discloses three interface formats and one operating format? No. I would say it discloses one operating format that follows the interface step. The interface format, I'm not sure, is a term, and I believe it only appears once or twice, though, and not in a way, and the district court didn't construe the interface format, I don't believe. So, I believe, I think, it is describing the interface step for the function. What appears in figure two is what happens after it leaves the interface. And the three branches at the top of figure two are simply call modes and nothing else here? Correct. The calls can come in with an 800 number or a local area code number or a 900 number. That is identifying the source of the call and it may have a trip or dip or switch in the system, but that is not a format. That's a call mode. That's exactly right. Mr. Perry, what about the due process argument? Your Honor, the due process argument is, it is unprecedented and it's rather extreme. The plaintiff here recognized the need to limit these claims, agreed with claiming protections, never challenged the 16 claim limit imposed for each of the defendants before this court, and in fact, as to my client and the rest, ultimately selected less than 16 claims. So to this day... But is that fair? If the record does show that there was some debate, reluctant acceptance of the limit? Your Honor, they proposed 20 and the district court proposed 16. So it was a small difference. But the ultimate question was 16. They only came up with 15 against cable business. They only came up with 6 against American Airlines. So while they say they want all the other claims, to this day, in this court, look at their briefs, they cannot identify one single claim that is both valid and infringed by any of the systems of the five defendants before this court. But are you saying that they did not ask the district court for the preservation of rights of any sort with respect to the others? Your Honor, they asked for severance and stay but never made the showing necessary to carry that out. They never said that the court abused its discretion in setting limits. They never said, they never tried to make the showing that the court allowed them to make of non-duplicativeness. And by the way, the district court said duplicativeness but it did not mean duplicate as that phrase is used at the patent office. What he meant is substantial overlap between the asserted claims and the non-asserted claims. They didn't come forward and show that there were extra claims to be asserted against these defendants. But they're more large than that, I think. This may be a little oversimplified but the gist of their argument certainly is that that wasn't their job. That it was your job in a subsequent proceeding after those claims had been severed and stayed to show that if you want on everything here that you could have collateral supple applied with respect to all the other claims. Judge Bryson, when they made that argument to the district court we the defendants came forward with a detailed, specific, factual showing of the substantial overlaps within this portfolio. Remember, all these patents proceed from a single common application back in the midst of time. They were divided and so forth but they're all related. And the defendants came forward with a very specific claim by claim analysis. It was a subset of claims but it was very specific including every single patent that won subject to terminal disclaimers. The record, the file histories show that that was because the examiners kept saying these claims are not patently distinct. And Katz acknowledged that. And so the defendants came forward with that specific showing and the district court noted three separate times, Your Honor, that the plaintiff, the owner of the portfolio, the person who presumably knows the most about it of anybody, never came forward to rebut that showing or to make a showing of its own. In fact, the plaintiff presented no analysis of the portfolio showing that there were claims beyond these limits   It is the obligation of a claimant in our federal courts to show why procedures are necessary and it is not the obligation of the plaintiff to show why procedures are necessary and it is not the obligation of the plaintiff    of the plaintiffs to show why Well, sometimes that's still an issue they've already agreed and acquiesce and appreciated that there had to be a significant focus for the forthcoming trial which they expected would take place Judge Newhan, that would be my second answer, is if their arguments now were accepted the party can go in with 1975 claims agree to a trial on 16 or 30 or 50 or whatever chew up five years of district court litigation bring 26 issues up on appeal and then go start the whole thing over again with the 1945 claims that they didn't assert and go through another five years of litigation and bring another 26 issues up and make the same argument that they never could be precluded until all 1975 claims had been tried to judgment No, the second proceeding if you're right that all of these claims are duplicative the second proceeding would be a pretty short one in which the entire issue would turn around collateral estoppel, right? Your Honor, we hit back and that collateral estoppel issue is there regardless about the court Sure, but that would certainly mean you wouldn't have eight trials or whatever it is in all likelihood if you're right at least In all likelihood, Your Honor, but there's also no need for that second proceeding at all because here they brought the portfolio into court they agreed limitations were necessary but what they wanted to do is hold their fingers crossed behind their back and say well, we'll try these and if that doesn't work we'll go try some other sets That may be a valid advocate's approach but it is incumbent on that advocate to then come forward and say here is at least one claim that I can win on Remember 28 U.S.C. Section 2111 Your Honor says that this court must disregard anything that doesn't affect the substantial rights of the parties This court has no power to order the district court to do something else unless Katz's rights have been violated They can't show one claim that didn't get selected that they could win on There's no reason for the court to That would be the case  district court didn't give them enough opportunities to get a hiring They don't dispute that the court has the discretion to do all that They want to jump straight to the Constitution and say that every portfolio holder has a Constitutional right to litigate the judgment of every portfolio holder The state may erect reasonable procedural requirements for triggering the right to an adjudication The state certainly affords due process when it terminates a claim for failure to comply with a reasonable procedural rule Here we have a reasonable procedural rule that they don't challenge and the claim has been terminated on that basis That's the end of the lawsuit Let me ask you this question which is contrary to this I'll propose that maybe it's not right Despite that Is it clear to you that by virtue of having denied the stay and sever request that this district court's judgment has terminated all of the plaintiff's rights on all those other claims or would that be something to be litigated in another case if they brought another case in another case Judge Bryson there is no injunction prohibiting cats from filing another lawsuit If they do the defendants would have their due process objection Thus far that is not concluded by this order   The defendants came forward on these issues with what amounts to a no evidence motion. There is nothing in  specification to support those claims. The defendants don't have to put up an expert to say that. The plaintiffs did in response point to their expert Dr. Brody. In their briefs they cite Dr. Brody twice as often as their own patents. Experts cannot create facts. They can explain facts. They are very useful for that. But they cannot create facts. The problem is that the evidence put forward by Dr. Brody repeated by plaintiffs in this court are not supported by the specification. The defendants have no evidence to explain what a person in this field would understand recognizing that we are now talking not to patent examiners and not to technologists but to judges who were not experienced in this field. And it is very much in that area that their experts filled the gaps of understanding of what someone in this field would already know. On some claims the answer is absolutely yes. In fact it is important to point out the plaintiffs only argue about the claims they lost. They won more than three quarters of the invalidity challenges. In this case 76% of the arguments they won including many that the district court said you are right. Dr. Brody explains the patent in a way that either rejects the argument or creates a genuine issue of fact. They won 83% of the arguments. They prevailed every time. Their argument is so pristine that it doesn't contain a single invalid claim. What the district court did was reject most of the arguments and said on a few claims it did not create a genuine issue of fact. On those few   district court said you can do something else with it which is not the function of the written description requirement. He is not explaining what is disclosed. The district court said on those few claims it    genuine issue of fact. The district court said stop them.  Brody is going beyond his role. He is not describing what is in the specification but rather what he would do with the specification. Over and over again on these few claims that was the failure of evidence. They don't argue that the district court should be reversed because of what is in the patent. They don't rely on the specification. They go back to Dr. Brody and they don't argue  him. It is a question of visually displaying customer data. Dr. Brody says in effect that a person would understand that you could connect the system and display various things. The patent doesn't carry out its disclosure obligations. The district court recognized many other claims that Dr. Brody made, but here he said it is just not in the specification. When that happens, the claim is over. In fact, the plaintiff's claim really runs into the decision in Ariadne. Ariadne emphasizes that the test is an objective inquiry into the four corners of the document. The arguments are not based on the  disclosure obligation. The plaintiff fell short on these claims. They have a lot of patents. They have very detailed specifications. They have many claims that were sustained by the district court. These patents have 200 claims. They have multiple limitations, and the patentee did not discharge its obligation to disclose the limitations. That is a failure of drafting. It is a failure on the patentee's part. But the claims are part of the specification. There's no   disclose the limitations. They are all added later in the prosecution and the specification doesn't support them. That's the basic problem. We don't get to look to the claims when they are not original for written description. Not for written description and they only disclose the limitation. The disclosure obligation isn't carried out here. I assume that if the priority date is not all the way back, these claims wash out. I think that's correct as to the multiple format and so forth. I think they make the visual display argument but it's tied up with the priority date. Can you address for me very briefly the claim of non infringement with respect to American Airlines and particularly whether this relates to claim 43 which is a dependent claim to 27 and 863 patent and in particular whether the system stores information that's representative of caller of interest data. If I understand the claim limitations that's the requirement of the claim and the question. Your Honor, I have to give you two answers. First is Mr. Ayers. My understanding is this is another one of those  cases    is not representative of caller of interest data. I would like to briefly address some of the comments by counsel. If you take exception to the characterization by counsel in this case, the record simply does not support that. In fact, as we noted in our briefs, we out of the gate in case management discussions proposed the limitation of 50 claims initially per defendant group down to 20 per defendant group after substantial discovery was obtained. We did not propose a global limit across all defendants other than implicitly 20 times the number of defendants at any given time. That was a problem. The district court imposed that we felt the draconian limit of 64 claims across 67 defendants, and then added the extra layer that if you want to add anything else, you must show me in the context of these proceedings that your claims are not duplicative. That's the analysis that the standard acknowledges is something that the district  has to do. We did not come out of the box saying this is a 1975 claim case, but where we are now is that we have this uncertainty about whether these final judgments entered on the  basis as the other claims. We believe we could file additional  but there we have to litigate the issue of did we get the appropriate due process protections in addition to the other  We believe that we could have much earlier filing dates of these lawsuits 2005-2006 since the patents have all subsequently expired are damages that would be dramatically cut if not entirely eliminated if our filing date were deemed to be at the time of the new lawsuits. If the judgments have been entered and they characterize an invalidity the entire sweep of all the patent claims have been invalidated then you would have a very short proceeding. The second district would look at it and say the judgments are independent. I don't think the judgments are as clear as Mr. Perry indicated. I think we would have a question of whether we have     or an inaccurate judgment. Mr. Perri? Okay, I'll ask Dr. Antonio. I just want to raise a couple of points. First of all, as to Mr. Perry's discussion with regard to visually displaying and his characterization of the evidence that Katz presented, it's completely inaccurate. If one looks at 61-64 of our opening brief, you'll see multiple references to the 360 patent which shares the same specification and presents the specific elements which we believe support the visually displaying capability. This technology lends itself to the explanation not only due to its complexity but also due to the time period. We're talking about inventions made 22 years ago. It's something to sit here and look at.  haven't been able to put ourselves back into position as to how they would understand the written description at the time was important. If we look at the paragraphs from the declaration that have been cited in our document, we have included a good deal of the patent specification in addition to the explanatory material that Dr. Brody has provided. Secondly, as it relates to the 863 issue and claim 96, first of all, when we talk about the claim construction issues below, the parties did not agree that element 92 was the only element which corresponded to the means. In fact, there was a dispute as to whether element 92 and alternative structures would correspond to those means. And the court found that element 92, rather than processors PR1 through PRN, did not accept our position as to the alternative structures at that time. During the course of the summary judgment proceedings, we presented sufficient evidence to show that the interface structure 20 also is a corresponding structure. It's a specialized structure that doesn't need algorithms. As an aside, even if this court were to go ahead and apply a strict rule that some algorithms would be necessary for the processing unit to correspond to these means for processing  we presented sufficient evidence to show that that specialized structure certainly corresponds to the means for processing. Mr. Perry is reading functionality into the means for processing. The claim language just simply states means for processing. There are a   do that. It's dramatically different from the elements that we see in aristocrat where the means was for defining a predetermined arrangement for a current game. Different than in net money where the means generated an authorization in response to queries. Different than in blackboard where the means was for assigning a level of access to a control for a given file. Each of those were specific functionalities that were being called out for. To be able to get to the point where aristocrat applies, Mr. Perry must be able to get to the point where the means for processing simply stated is the processing of data. Any more questions? Thank you all. The case is taken under solution.